UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

In re:

THE MARY A II, LLC,     Case No. 11-40693-LMK
                        Chapter 11

    Debtor.
_____/

**MOTION TO DISMISS CASE FOR BAD FAITH AND**
**MOTION TO DISMISS OR CONVERT CASE PURSUANT TO 11 U.S.C. §1112(b)(1)**

Spur Ranch, LLC, (the "Spur Ranch"), by and through its undersigned counsel, hereby moves to dismiss this Chapter 11 case for bad faith and pursuant to 11 U.S.C. §1112(b)(1), and in support thereof, states:

**Introduction and Preliminary Statement**

This bankruptcy case should be dismissed as a litigation tactic and attempt to avoid the legitimate foreclosure action of Spur Ranch. The Mary A II, LLC (the "Debtor") filed this case hours before a summary judgment hearing where it had little to no defense and months after a receiver was appointed over its property by reason of its failure to adequately maintain and remedy serious problems on the property. Even more telling, the Debtor waited nearly three months after a receiver was appointed and only after the receiver took the actions that the Debtor was either unwilling or unable to take to bring the property into compliance. The Debtor's actions demonstrate its bad faith in the filing of this case and form the basis for this Court to dismiss the case.

**Factual Background**

1. Spur Ranch is the owner and holder of a loan made by Federal Trust Bank to the Debtor in the original principal amount of $6,650,000 (six million six hundred fifty thousand) (the "Loan"). The Loan is evidenced by a Renewal And Consolidation Promissory Note date July 20, 2007.

2. As security for the Loan, the Debtor pledge certain real and personal property as described in that certain Mortgage and Security Agreement dated August 17, 2004 (the "Property") and recorded at O.R. Book 5356, Page 8099 of the Public Records of Brevard County, Florida, as subsequently modified and renewed (the "Mortgage").

3. To further secure the obligations under the Loan, the Debtor executed an Assignment of Rents, Leases, Profits and Contracts (the "Assignment of Rents"). The Note, the Mortgage, the Assignment of Rents and all other documents evidencing the Loan shall be referred to herein as the "Loan Documents."

4. The Property which serves as collateral for the Loan includes 2,068.5 acres of land at the Southern Border of Brevard County, in the St. Johns River Water Management District and certain personal property associated therewith. The Property was formerly a citrus grove, but was re-permitted in November 2002 as a wetlands "mitigation bank" known as The Mary A Mitigation Bank.

**Wetlands Mitigation Banking**

5. Wetland mitigation banking is the present day restoration of degraded wetlands to pristine conditions in return for ecological "credits" which are then sold to third parties in order to offset development activity which negatively impacts wetlands. It is in satisfaction of

the command of Section 404 of the Clean Water Act, which specifies that all wetland impacts must have a net zero effect; an acre of wetland destruction must be offset by an acre of wetland creation. The end result is a permanently preserved large tract of wetland habitat consolidated from a myriad of various public and private development projects within a defined watershed.

6. In October 2004, the mitigation bank's original permit was transferred to The Mary A II, LLC. The original permit details the number of credits available for resale by owner upon compliance with the conditions of the permit specifically describing the environmental restoration and maintenance required to be completed by the owner. Such environmental restoration and maintenance includes erosion and sediment control measures, alterations to the surface water control system, and elimination of nuisance or exotic species. The purpose of the project is to contribute to the viability of various listed species that are known to the St. Johns River Water Management District (the "District") to occupy the region.

7. As specifically set forth in the Permit "[t]he Bank is expected to be able to provide typical freshwater marsh functions, wet prairie functions, and some functions of forested wetlands." To this end, the property is subject to a conservation easement that is of record, as well as the monitoring function of the District.

8. As part of the District's monitoring of the project, annual reports are required to be submitted, and water levels must be recorded at least monthly. To ensure that the expenses of the restoration and maintenance of the mitigation bank are met, the Permit further requires documentations of financial responsibility in the form of a trust set up to ensure that

monies are available to perform the restorative and maintenance work required.

9. By the express terms of the Permit, however, the District may withdraw these mitigation credits "if at any time the Bank is not in material compliance with the terms of this Permit." Permit ¶33. At this time, The Mary A Mitigation Bank is not in compliance with its Permit.

10. As a mitigation bank, the Debtor has been restored to the state of undeveloped Florida wetlands. Once the environmental restoration project was complete, the owner was awarded credits from the District and the Army Corps of Engineers which could then be sold to public and private developers of projects located within its mitigation service area to offset, or mitigate, any adverse environmental impact caused by the development.

11. The Property has negative value in and of itself because the cost of maintaining it as a functioning Florida wetlands ecosystem is not offset by any economic use of the land. Rather, the value of the mitigation bank lies in the mitigation credits marketed and sold to third parties.

### Debtor's Default and the Foreclosure Action

12. The Debtor breached the terms of the Loan Documents by failing to make the payments due on July 17, 2009, and each and every payment due thereafter.

13. The Debtor's default resulted in the filing of an action to foreclose the Mortgage on the Property and to collect on a guaranty provided by the Debtor's principal, James Rudnick ("Rudnick"). This action is currently pending in the Circuit Court for with Eighteenth Judicial Circuit in and for Brevard County, Florida as case no. 2010-CA-032241 (the "Foreclosure Action").

14. Currently, Spur Ranch is owed approximately $8 million. A true and correct copy of the Affidavit of Christopher Marine filed in connection with the Foreclosure Action is attached hereto as **Exhibit "A."**

15. At various depositions and hearings, the Debtor has admitted that the loan documents are valid and enforceable and the existence of the default described herein.

16. On June 7, 2011, the state court appointed John Kurtz as receiver (the "Receiver") over the Property based, in part, on the Debtor's failure to maintain the Property and maintain compliance with the standards required by the District. A true and correct copy of the Receiver Order is attached hereto as **Exhibit "B."**

**Debtor's Failure to Maintain Property as Required for Mitigation Banking**

17. Specifically, the Debtor allowed torpedo grass, an exotic species that is extremely difficult and costly to eradicate once established, to cover as much as 70-90% of the Property. The District has also found and reported other noncompliance items, including: (a) failure to provide monitoring reports as to water levels; (b) failure to provide monitoring reports of vegetative species and cover estimates; (c) failure to provide burns schedules; (c) failure to provide water level control schedules; and (e) failure to provide eradication and management plans for invasive, exotic or inappropriate vegetation.

18. As a result of these noncompliance issues, the District warned the Debtor that "Failure to meet the terms of the Permit and a determination of material non-compliance would result in freezing the mitigation bank credits until the bank is brought back into compliance."

19. At his deposition on February 4, 2011, Mr. Rudnick testified that he had no plan to take care of the torpedo grass and would not commit the funds to remedy the problem while the Foreclosure Action was pending. In fact, as one of main reasons for the appointment of the receiver, the state court found that the torpedo grass was a threat to the Property and would constitute waste if no destroyed right away and that the court was not convinced that Mr. Rudnick would do so.

20. Since his appointment, the Receiver has instituted a plan to eradicate the torpedo grass and thereby restore The Mary A Mitigation Bank's standing with the District and ensure its ability to continue selling credits.

### Debtor Fails to Turnover Financial Records

21. After the Receiver's appointment on June 7, he attempted to gather the financial records of the Debtor in order to fulfill his responsibilities pursuant to the Receiver Order. Despite repeated requests, the Debtor was not forthcoming with its financial records. After a conference call with the Mr. Rudnick on July 20, the Receiver did receive some financial records, but had numerous questions about those records, which he outlined in a letter dated August 3, 2011. The Receiver asked, among other questions, why the balance sheet showed three bank accounts when the principals stated there was only one. The Receiver also questioned the presence on the balance sheet of two aircraft and why such assets had not been turned over to the Receiver. The Debtor then took the position that these assets were no longer owned by the Debtor. These deficiencies resulted in the filing of a Motion to Compel for Entry of Sanctions, but this Motion was not heard prior to the filing of this bankruptcy case. A true and correct copy of the Motion to Compel with exhibits is

attached hereto as **Exhibit "C."**

22.     The Foreclosure Action was scheduled for a summary judgment hearing on August 29, 2011 and was on the court's trial docket beginning September 6, 2011. Just hours before the summary judgment hearing, the Debtor filed this Chapter 11 case.

23.     For the reasons stated below, Spur Ranch asserts that the Debtor's case was filed in bad faith and for an improper purpose and should be dismissed.

## LEGAL ARGUMENT

24.     A bankruptcy court "shall' dismiss or convert a bankruptcy case for "cause" unless "unusual circumstances specifically identified by the court … establish that the requested conversion or dismissal is not in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). "Cause" exists when a bankruptcy petition is not filed in good faith. *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988); *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984).

25.     In deciding whether to dismiss a Chapter 11 petition as a bad faith filing, this Court should examine the guidelines set forth by the Eleventh Circuit in *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir. 1988) and *In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir 1984). *See also State Street Houses, Inc. v. New York State Urban Development Corp.* (*In re State Street Houses, Inc.*) 356 F.3d 1345 (11th Cir. 2004). The following *Phoenix Piccadilly* factors all strongly support dismissal of Debtor's case as a bad faith filing:

> (1) whether the debtor has only one asset;
>
> (2) whether the debtor has few unsecured creditors, whose claims are relatively small compared to claims of secured creditors;

>(3) whether debtor has few employees;
>
>(4) whether the property is subject to a foreclosure action as a result of arrearages on the debt;
>
>(5) whether debtor's financial problems are essentially a dispute between debtor and the secured creditors which can be resolved in the underlying action; and
>
>(6) the timing of debtor's filing and whether it evidences intent to delay or frustrate legitimate efforts of secured creditors to enforce their rights.

The *Phoenix Piccadilly* factors for dismissing a Chapter 11 case as a bad faith filing "are non-exhaustive and not to be rigidly applied…". *State Street Houses*, 356 F.3d at 1347.

26. This case exhibits nearly all of the *Phoenix Picadilly* factors. The Debtor's only asset is the Property and the rights associated with that Property, all of which are subject to a first mortgage in favor of Spur Ranch. The Debtor appears to have either one or no employees. (See Case Management Summary Doc. No. 5).

27. This case was filed only hours before the state court was scheduled to hear summary judgment and one week before the case was set for trial. This is a two party dispute between the Debtor and Spur Ranch. This bankruptcy was only filed as a litigation tactic after the Receiver was appointed. Notably, the Debtor waited to file this case until after the Receiver took considerable steps to repair the damage to the Property (and the potential damage to the ability to sell mitigation credits) that were caused by its mismanagement and that Mr. Rudnick refused to address. Further, while the Debtor lists several unsecured non-priority creditors, all but four of those creditors are investors. (See Schedule F Doc. No. 1).

28. A Chapter 11 case that is filed as a litigation tactic also is filed in bad faith and as such, subject to dismissal. *In re Gooding*, 234 B.R. 157 (Bankr. N. D. Fla. 1999); *In re*

*Moog*, 159 B.R. 357 (Bankr. S. D. Fla. 1993); *In re Hatcher*, 218 B.R. 441 (8th Cir. BAP 1998).

29. Dismissal is particularly appropriate "when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Albany Partners*, 749 F.2d at 674. The Debtor here has no realistic possibility of an effective reorganization. The Debtor asserts that it will reorganize through the sale of mitigation credits; however, the facts demonstrate that this is an illusory plan. The Debtor's history shows that it has had very minimal sales in the last two years. (See Exhibit B to the Debtor's Disclosure Statement – Doc. No. 8). Yet, the Debtor proposes that it can turn this around and in short order sell enough mitigation credits to generate over $5 million – which amount is still not sufficient to pay its secured debt in full and generate a distribution for unsecured creditors. The contract with Brevard County has been in talks for several years and as of today, there still is no contract. Even if there was a contract, the project is not scheduled to be completed and full payment received for several years. Additionally, the Debtor's Plan seems to be premised on the Property being valued at $25 million, but this valuation is based on a 3 year old appraisal with numerous assumption that are inconsistent with reality. Spur Ranch believes the Property's value to be much closer to the amount of its debt.

30. Further, cause exists to dismiss or convert this Chapter 11 case pursuant to 11 U.S.C. §1112 due to:

    a. The Debtor's gross mismanagement by failure to maintain compliance with the District's requirements to continue selling mitigation credits which put the

9

estate's assets in serious risk;

b. The Debtor's failure to comply with the Receiver Order in not cooperating with the Receiver or turning over to the Receiver accurate and complete financial records necessary to perform his duties;

c. The substantial and continuing loss and diminution of the estate and no reasonable likelihood of reorganization. The Debtor's business is not currently generating revenue and there is only a mere hope that it will create revenue in the near future. Meanwhile substantial funds need to be expended to maintain and keep the Property in compliance with District requirements so that the Debtor can keep its permit and right to sell mitigation credits – its only source of income; and

d. The Debtor's failure to maintain adequate books and records and sufficient corporate records. The Debtor submitted to the Receiver records showing the ownership of two aircraft, but then denied ownership when questions about those assets. Spur Ranch submits that a 2004 examination is required by reason of these facts alone.

31. As support for this Motion, the Debtor is filing simultaneously herewith transcripts of the proceedings and depositions in the Foreclosure Action.

WHEREFORE, Spur Ranch respectfully request that this Court dismiss this Chapter 11 case and grant such other and further relief as this Court deems appropriate, including the appointment of a Chapter 11 trustee.

> */s/ Lori V. Vaughan*
> LORI V. VAUGHAN
> Florida Bar No. 0154921
> lvaughan@trenam.com
> TRENAM, KEMKER, SCHARF, BARKIN,
>  FRYE, O'NEILL & MULLIS, P.A.
> Post Office Box 1102
> Tampa, Florida  33601-1102
> Telephone: 813 223 7474
> Facsimile: 813 229 6553
>
> Counsel for Spur Ranch Enterprises, LLC

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing *MOTION TO DISMISS* was furnished on September 2, 2011, by the Court's Electronic Noticing System (ECF) and/or by U.S. mail to: **Debtor, the Mary A II, LLC**, 226 N. Duval Street, Tallahassee, FL 32301-1314; **Brian G. Rich, Esq**., Berger Singerman, 125 S. Gadsden Street, Suite 300, Tallahassee, FL 32301-1589; **Jason H, Egan**, US Trustee, 110 E. Park Avenue, Suite 128, Tallahassee, FL 32301; and **All Parties In Interest (**which also includes 20 Largest Unsecured Creditors) (matrix attached).

> */s/ Lori V. Vaughan*
> Attorney