UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

In re:

THE MARY A II, LLC,                                        Case No. 11-40693-LMK
                                                           Chapter 11

      Debtor.

_____/

## DEBTOR'S[1] RESPONSE IN OPPOSITION TO SPUR RANCH, LLC'S MOTION TO DISMISS CASE FOR BAD FAITH AND MOTION TO DISMISS OR CONVERT PURSUANT TO 11 U.S.C. § 1112(b)(1)

The Mary A II, LLC ("Debtor"), by undersigned counsel, files this response in opposition to the *Motion to Dismiss Case for Bad Faith and Motion to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)(1)* ("Motion to Dismiss") [D.E. 24] and states:

### Preliminary Statement

The Debtor filed this Chapter 11 case with the legitimate goal of reorganizing its financial affairs and with an honest belief that it can do so for the substantial benefit of *all* of its creditors, not just movant Spur Ranch Enterprises, LLC ("SR").   This case, unlike so many other cases that have recently come before this Court, presents a debtor that has significant equity in its property and the opportunity *and* ability to repay all creditors in full.  The basis for this is not pure speculation as suggested by SR, but based upon facts.   SR is not a traditional institutional lender.  SR targeted the Debtor's property (the "Property"), attempted to buy it pre-petition and when those efforts failed, it acquired the Promissory Note and Mortgage from the Debtor's original lender[2] with the sole intent to obtain the Property and reap a significant windfall at the expense of the Debtor's *other* creditors.   This Chapter 11 case was filed so that all creditors, not

---

[1] Discovery is ongoing and the Debtor reserves the right to supplement this Response.
[2] For reasons unknown to the Debtor, despite efforts by the Debtor to try to acquire the note and mortgage, the original lender would not give the Debtor even the opportunity to acquire the note and mortgage.

just SR, can obtain a recovery.   SR glosses over the fact that there are numerous other creditors in an attempt to characterize this case as simply a two-party dispute.   These creditors are legitimate unsecured creditors. Thus, while there are two parties—the Debtor and SR—that are at odds, there are numerous *other* creditors of the Debtor owed approximately $2.1 Million that have a direct, pecuniary interest in a reorganization of the Debtor's financial affairs as opposed to a forced liquidation of the Property subject of SR's alleged lien and a dismissal of the case that would likely result in them getting nothing, despite the equity in the Property.

As will be set forth herein, the Debtor sells mitigation credits.   As to value of the Property, there is a pending sale of credits noted by Receiver John C. Kurtz ("Receiver") in his July 11, 2011 Report ("Report")[3] which is set to close on January, 2012 and will result in proceeds of  approximately $1.1 Million. There is a non-refundable deposit that has been posted in the approximate amount of $110,000.00.   Additionally, despite SR's self-serving characterization of pending negotiations with Brevard County over the sale of additional credits, the fact of the matter is that in all likelihood the proposed sale of 58 credits will come to fruition sooner rather than later, and result in proceeds of approximately $4.6 Million.  Of note, on the Petition Date (as defined below), the Debtor filed a disclosure statement ("Disc. Statement") [D.E. 8] and Chapter 11 plan ("Plan") [D.E. 9] with specific terms to address SR's secured claim which, of course, even ignoring counterclaims and possible equitable subordination claims that the Debtor has against SR [*See* Debtor's Schedule B, Item 21, in respect of litigation that was pending before the Brevard County Circuit Court on the Petition Date], is far less dollar-wise than the substantial value of the credits available to the Debtor to sell. *See also* Note 4, *infra*. While SR asserts that the filing of the case was nothing more than a litigation tactic to frustrate

---

[3] The Receiver's Report is attached as Exhibit "C" to the Disc. Statement.

their efforts; the filing of the Plan *on the first day of the case* demonstrates the Debtor's desire *and* ability to move this matter to conclusion promptly.  SR simply doesn't like this outcome because if the Plan is confirmed, their best case scenario is that they get paid their debt with interest as opposed to their *actual* goal which is clearly to snatch the Property from the Debtor for SR's own benefit and to the substantial detriment of the Debtor's *other* creditors.  The Debtor should be given the opportunity to confirm the Plan.

As explained in the Disc. Statement, the Debtor holds the right to sell approximately 937.69 mitigation credits approved and permitted by the St. Johns River Water Management District and 847.92 mitigation credits approved and permitted by the U.S. Army Corps of Engineers (collectively the "Credits"), inclusive of the Credits subject of the pending and contemplated sales described above, respectively. Critically, according to the Receiver, "the recent historical price for a District credit with the [Debtor] has been $40,000 per credit." Report at 4. Federal Credits have been sold for as high as $90,000.   Thus, as explained above, there is substantial value that can be realized by the Debtor *far* in excess of the approximate $5.2 Million debt[4] owed to SR (again, completely discounting for present purposes the counterclaims and potential equitable subordination claims that the Debtor holds against SR).

In short, for these reasons, and the additional reasons set forth below (including the purported *bona fides* of SR in filing the Motion to Dismiss), the Court should deny the Motion to Dismiss and allow the Debtor to restructure its finances through the Plan before the Court.

---

[4] The Debtor strongly disputes SR's claim that it is owed $8 Million.  But even giving SR the benefit of the doubt, the Property is still worth substantially more than the secured debt.  This fact will likely be acknowledged by SR's own appraisal.

3

**Background**

General Background/Finances/Credits

The Debtor is the subject to that certain Promissory Note, as amended and Mortgage with Federal Trust Bank ("Fed Trust"), wherein Fed Trust loaned the Debtor approximately $5.2 Million. Fed Trust sold or otherwise assigned the Promissory Note and Mortgage to SR. As set forth above, the Debtor attempted to acquire the Promissory Note and Mortgage from Fed Trust, but for reasons unknown to the Debtor those efforts were rejected by Fed Trust.   Upon information and belief, SR acquired the Promissory Note and Mortgage at a discount. Of note, SR or an affiliated entity is in the *same* business as the Debtor (however, their property has not yet been approved as a mitigation bank) and SR acquired the Promissory Note and Mortgage *after* negotiations for SR's proposed purchase of the Property fell through, calling into question SR's *bona fides* in filing the Motion to Dismiss which appears to be nothing more than a strategic play to acquire the Property at a deep discount to the detriment to the Debtor and its *other* creditors. The Promissory Note called for significant principal pay-downs during the term of the loan. The Debtor has been negotiating with multiple parties for the sale of certain Credits, which will allow the Debtor to make the payments to SR.   Additionally, the Debtor has the ability to raise funds and to possibly make adequate protection payments and ultimately interest payments.   SR has not demonstrated a willingness to discuss such options, which the Debtor submits is further evidence of SR's bad faith and true intentions.

However, the sale of the Credits has not yet been finalized.  It should be noted that the Debtor is presently negotiating the sale of approximately 70 Credits which will result in proceeds in excess of $5 Million (one contract has been executed and the closing date is set for January 2012). This $5 Million of sales represents *less* than 10% of the total Credits available for sale by

4

the Debtor. Thus, after these sales the Debtor will still have available approximately 820 Federal Credits and 920 State Credits available to sell, which is all the more noteworthy because according to the Receiver, historical sales place the value of each credit at $40,000. Report at 4. It should be noted that the sale of the Federal Credits will likely generate significantly higher returns (approximately $80,000-$90,000 per Credit) than the State Credits.

In 2010, SR filed a lawsuit in the Circuit Court of the Eighteenth Judicial Circuit, in and for Brevard County, Florida against the Debtor seeking to foreclose upon the Debtor's Property; also pending before the state court is the Debtor's counterclaim which alleges among other things, tortious interference. The Debtor intends to object to the SR claim and challenge it on numerous grounds.

On June 7, 2011, the state court appointed a Receiver to undertake any and all actions necessary, proper or appropriate to preserve and protect the Debtor including, but not limited to, taking possession and control of all assets of the Debtor. Efforts to resolve the issues with SR proved fruitless as the Debtor submits that SR doesn't actually wish to negotiate in good faith as it will stop at nothing to obtain the huge potential windfall by foreclosing upon the Property and realizing the value of the Credits to the detriment of the Debtor's *other* creditors.

The Debtor filed this Chapter 11 case to restructure its obligations and sell the Credits for the benefit of *all* of its creditors, not just SR. In addition to the debt to SR, the Debtor raised certain debt financing through the sale of certain Series A and Series B Notes ("Notes"). Through these Notes, the Debtor raised in excess of $2 Million. The Debtor submits that SR is *substantially* over-secured and that through the sale of Credits SR will be paid in full with interest, subject to resolution of the dispute about the amount of the debt owed to them, and that all creditors' claims can be satisfied in full over time, with interest, as provided for in the Plan.

5

Summary of the Plan

Allowed Administrative Expense Claims and Allowed Priority Claim will be paid on the Effective Date or upon such other terms as the Debtor and the holder of each Allowed Administrative Expense Claim and Allowed Priority Claim shall agree. The Class 1 Claim of Spur Ranch shall retain its lien on the Property and be paid 4% interest, interest only payments for 2 years, with principal and interest payments commencing in year 3 based upon a 20 year amortization and a 3 year balloon payment. Additionally, as Credits are sold, SR shall receive 75% of all proceeds to be applied as principal reductions. The Debtor anticipates that SR will receive in excess of $4 Million in principal reductions on its $5.2 Million claim *prior* to the end of 2012. Upon principal pay downs, the debt shall be reamortized and payments adjusted accordingly. The Debtor reserves the right to challenge all or a portion of SR's Class 1 Claim. The unsecured Allowed Claims of governmental units, if any, entitled to priority under Section 507(a)(8) of the Bankruptcy Code shall be paid in full in cash on the Effective Date or over time as provided for in the Bankruptcy Code.

Class 2 Note Holders shall be paid quarterly payments (commencing the first quarter after the Effective Date) based upon 4% interest, interest only payments for 2 years, with principal and interest payments commencing in year 3 and a 3 year balloon payment (total 5 year term). Class 2 Note Holders shall be paid from the sale proceeds of Credits, after the payments to SR or upon additional funding raised or issued by the Reorganized Debtor, if necessary. These Claims aggregate approximately $2 Million. Class 3 General Unsecured Creditors (of which there are thirty-six (36), *see* Schedule F to Debtor's Petition) shall receive payment in full with a payment of 50% on the Effective Date and 50% on the one year anniversary of the Effective Date.

3921325-2

<u>Torpedo Grass</u>

There are certain, relevant facts conspicuously absent from SR's self-serving characterization of the "torpedo grass" issue, including reference to testimony of Mr. Rudnick at a February, 2011 deposition. SR claims that the Debtor allowed torpedo grass to cover as much as 70-90% of the Property, and that it is "extremely difficult and costly to eradicate once established." Motion to Dismiss, ¶17. What SR does *not* mention is that the Debtor had been evaluating the issue and had asked SR to release available Debtor funds to deal with the issue but SR refused. Also absent from SR's description of the issue is the fact that the Receiver hired a firm (the *same* firm that the Debtor sought to retain) and for approximately $25,000 the torpedo grass was eradicated in about 3 days. In short, the problem was not nearly as great or expensive to remedy as made to sound by SR and, in any event, it has been resolved such that the permit referenced by SR is no way jeopardized.

<u>Financial Records</u>

SR asserts that the Debtor was not forthcoming with respect to document requests by the Receiver, and that the Debtor responded partially and explained that certain aircraft were no longer property of the estate. The Debtor disputes the characterization of events as described by SR. as well as those in the motion to compel to which SR referred which was *never* adjudicated such that the allegations contained therein are just that—allegations.   The Debtor submits that it did provide responses to the Receiver, but that SR simply did not like the answers.  However, none of these issues put in question the Debtor's ability to attempt to reorganize which is based, in large part, on pending and contemplated sales of Credits, the remaining Credits available to be sold, and the value of those Credits.

## Argument

A bankruptcy court shall dismiss or convert a case for "cause" unless "unusual circumstances specifically identified by the court…establish that the requested conversion or dismissal is not in the best interest of creditors and the estate." 11 U.S.C. § 1112(b)(1). The Court should consider the Motion to Dismiss in the context in which it was filed, that is, SR—an entity attempting to get into the same business as the Debtor (and in the same geographic area) bought the debt owed to Fed Trust *after* negotiations for SR to purchase the Property broke down. In other words, the timing of the purchase of the Fed Trust debt evidences a singular and unmistakable effort by SR to obtain the Property through the backdoor. The reorganization proposed in the Disc. Statement and Plan, filed on August 29, 2011 ("Petition Date"), will maximize value for all constituents, not just SR. In short, the Debtor ought to be afforded a reasonable opportunity to seek confirmation of the Plan on file as of the Petition Date.

SR cites to Eleventh Circuit case law, including *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir. 1988), as providing factors to be considered in deciding whether to dismiss a chapter 11 case. While the factors articulated in *Phoenix Piccadilly* are helpful in identifying circumstantial indicia of a bad faith filing, the specific inquiry contemplated by the statute is whether a petition was filed in bad faith, not whether the non-exclusive list of factors set forth in relevant case law are present. Here, the Debtor firmly believes that it can create millions of dollars in value through a reorganization far in excess of the debt owed to SR, even assuming *arguendo* that the debt is the amount asserted by SR.

The Debtor is mindful of this Court's decision in *In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448 (Bankr. N.D. Fla 2011).[5]   In *Davis*, the Court found that factors which *may*

---

[5] Conspicuously absent from SR's Motion to Dismiss is citation to this Court's decision in *Davis Heritage*. It may be the case that SR did not want to remind the Court of its prior statement that, in

favor dismissal of a Chapter 11 case include (1) debtor's only asset is property, (2) the debtor has few unsecured creditors whose claims are small in relation to claims of secured creditors, (3) debtor has few employees, (4) debtor's property is the subject of foreclosure, (5) debtor's financial problems involve essentially a two party dispute, and (6) timing of debtor's filing evidences intent to delay or frustrate the secured creditors rights.   In making the determination, this Court explained that it should look to all the evidence and the totality of the circumstances to determine what is really happening and the true intent and purpose of the filing.  Here, while at first blush, SR has and will continue to argue that many of the above-referenced factors have been met, the Court must look at the totality of the circumstances, *including* the motivations and actions of SR.   There are numerous unsecured creditors who, on a combined basis, are owed a substantial amount of money (over $2 Million which, proportionally, is approximately 20% of the debt owed to SR).   SR is not a traditional institutional lender seeking to foreclose on its collateral.  This is, has been and will continue to be a strategic business play for SR.  The Debtor only filed its Chapter 11 case after efforts to resolve the matter with SR failed.

"Dismissal of a Chapter 11 bankruptcy case for bad-faith filing is a power that should be exercised with great caution." *In re Mill Ltd. P'ship*, 94 B.R. 139, 140 (Bankr. D. Minn. 1988). In isolating certain facts, SR narrates a story that would superficially wedge the Debtor into certain of the *Piccadilly* factors. However, the *Piccadilly* factors merely attempt to provide guidance in the determination of whether a petition was filed in good faith. More generally, to find a lack of good faith, courts emphasize whether the debtor is abusing the judicial process rather than making an honest attempt to reorganize. In *In re Albany Partners,* 749 F.2d 670, 674 (11th Cir. 1984), the Eleventh Circuit stated as follows:

---

considering whether to dismiss, it is appropriate to consider all of the relevant facts and the intent behind the filing.

> In finding a lack of good faith, courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization provisions. Particularly when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate legitimate efforts of secured creditors to enforce their rights, dismissal of the petition for lack of good faith is appropriate.

*Id.* Here, the fact that the Debtor filed the Plan and Disclosure Statement on the first day of the case which will treat SR's claim consistent with the confirmation requirements of section 1129 as it relates to secured creditors and pay other creditors (holders of administrative expense claims, priority claims and unsecured non-priority claims) in full evidences that there is, in fact, not only a realistic possibility but in fact likelihood of an effective reorganization.    SR will argue that the mere filing of a Plan is not enough to overcome a bad faith filing, but the Court needs to look at all of the circumstances including SR's intent as set forth in *Davis, supra*.   More fundamentally, the filing of the Plan and Disclosure Statement evidence that the Debtor is not seeking to abuse the judicial process but, instead, is making an honest attempt to reorganize its financial affairs consistent with the provisions of the Bankruptcy Code. As explained by the Eleventh Circuit,

> In a Chapter 11 case, the debtor-in-possession generally manages and administers his own bankruptcy estate, *with the goal of reorganizing his affairs rather than liquidating them. See, e.g., Canadian Pacific Forest Products, Ltd. v. J.D. Irving, Ltd.* (*In re Gibson Group, Inc.*), 66 F.3d 1436, 1442 (6th Cir. 1995) ("The purpose of [Chapter 11] is to provide a debtor with legal protection in order to give [him] the opportunity to reorganize, and thereby to provide creditors with going-concern value rather than the possibility of a more meager satisfaction through liquidation.").

*In re Alvarez*, 224 F.3d 1273, 1278 n.9 (11th Cir. 2000) (Italics added). *Accord U.S. v. TM Bldg. Products, Ltd.*, 231 B.R. 364, 369 (S.D. Fla. 1998) ("The purpose of Chapter 11 is to successfully rehabilitate the debtor.") (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984)).

10

The Receiver has acknowledged the substantial value that can be created by the Debtor by his recognition that on a historical basis each Credit can bring $40,000 which amount must be viewed in the context that the Debtor has approximately 1600 Credits available for sale. The Receiver acknowledged that there is a pending sale for certain Credits that will generate approximately $1.1 Million. There have also been ongoing negotiations for the sale of an additional 58 Credits which will generate approximately $4.6 Million. Notwithstanding SR's statements to the contrary, the fact that the development to which the contemplated sale applies is nearing completion, and construction for the required road cannot proceed until the Credits are purchased, militates strongly in favor of a realization that the sale will close sooner than later, and is certainly not the pipe dream as SR would have it.

In light of the pendency of the Disclosure Statement and Plan, and the upcoming confirmation process, the prejudice to the Debtor resulting from dismissal of its Chapter 11 bankruptcy case would be substantial, most likely wiping out millions of dollars in value in the form of Credits that could be sold for the benefit of *all* of the Debtor's creditors, while the prejudice to SR if the Motion to Dismiss is denied is minimal. If the Motion to Dismiss is denied, SR will continue to maintain its lien,[6] its secured claim must be treated as required by Code section 1129 in order for the Debtor to confirm its Plan, and SR's right to object to the Plan is preserved. In short, if the Motion to Dismiss is denied SR will maintain all of its rights, including to foreclose on its collateral if the Debtor cannot confirm its Chapter 11 Plan and the case is as a result converted to a case under Chapter 7 of the Code.

SR focuses on the fact that the Debtor filed its Chapter 11 case hours before a summary judgment hearing and one week prior to trial. According to SR, apparently acting as not only a

---

[6] If they do in fact have a valid lien which is not subject to offset or subordination.

3921325-2

party, but judge and jury, too, the result in its favor at the scheduled hearing (or trial if there were one) was a foregone conclusion. SR also submits that this case was filed as a "litigation tactic." If timing of a bankruptcy filing were dispositive of the good faith inquiry—which it is not—SR might have something. If the Court dismissed all cases that were filed on the eve of foreclosure, the Court would likely have a lot more free time.  The Debtor disputes that the summary judgment hearing was a foregone conclusion. And the Debtor most certainly disagrees with the proposition that it filed this case as a litigation tactic.   In fact, the Debtor was forced to file at the time it did based upon SR's litigation and strategic actions.  As explained above, the Debtor filed this case in an honest attempt to restructure its financial affairs, based on its firm belief that value will be maximized through a reorganization as opposed to a liquidation which will only benefit SR—which is precisely why SR seeks to have this case dismissed.

SR challenges the $25 million value assigned to the Property by the Debtor. SR states that the valuation is based on a 3 year old appraisal with numerous assumptions that are inconsistent with reality. SR submits its belief, without favoring the Debtor or Court with an explanation of the "numerous" assumptions purportedly not consistent with "reality," a more recent appraisal reflecting a different value than that assigned by the Debtor, or an explanation as to why SR believes the value to be closer to the amount of its debt.  While the Debtor, on the other hand, is updating the appraisal of the Property which will almost certainly show the value is still far in excess of the SR debt even if the debt is that claimed by SR.

At pages 9-10 of its Motion to Dismiss, SR sets forth items it claims constitute "cause" under section 1112. The Debtor will respond to each item raised by SR.

First, the Debtor disputes that there was "gross mismanagement" concerning the sale of Credits. The Debtor has one sale awaiting closing and has been actively negotiating a sale of

3921325-2

Credits to Brevard County that will generate approximately $4.6 Million. To the extent sales have not taken place at a clip as fast as SR (and the Debtor) would have preferred, the real estate market (and the national economy) is a significant factor that must be taken into account. The estate's assets are not at risk, let alone "serious risk," they are under the protection of this Court and the automatic stay and subject of a pending Chapter 11 Plan that is confirmable on its face.

Second, the Debtor disputes that it failed to comply with direction from the state court in the receivership case. As explained above, because the motion to compel was not adjudicated the allegations therein are just that—allegations—even though SR takes them as gospel for its clearly self interested purposes.

Third, the Debtor disputes that there is continuing loss to the estate and, for the reasons explained above, it firmly believes that there is a strong likelihood of a successful reorganization based on available Credits for sale, which will produce income far in excess of the debt to SR, even if SR's $8 Million figure is used as the guidepost. The pending sale and the contemplated sale of Credits to Brevard County are much more than a "mere hope."

Fourth, the Debtor disputes that it has failed to maintain adequate books and records. If and to the extent that SR believes that a 2004 examination is in order with respect to certain aircraft then it should set the Debtor down for such an examination.

## Conclusion

Based on the foregoing, the Court should deny the Motion to Dismiss and allow the Debtor an opportunity to confirm the Plan pending before the Court. At this very early stage of the proceedings any doubt should be resolved in favor of the Debtor and an attempt to reorganize

3921325-2

consistent with the rehabilitative policy reflected in Chapter 11 of the Bankruptcy Code.

> BERGER SINGERMAN, P.A.
> *Proposed Counsel for Debtor*
> 125 S. Gadsden Street, Suite 300
> Tallahassee, FL 32301
> Tel. (850) 561-3010
> Fax (850) 561-3013
>
> By: ___/s/   *Brian G. Rich*_____
>         Brian G. Rich
>         Florida Bar No. 038229
>         brich@bergersingerman.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served on the 19th day of September, 2011, via electronic transmission through the Court's CM/ECF system upon all parties on the attached CM/ECF Service List; and via first class, U.S. Mail upon all parties on the attached Master Service List, to the extent that such parties were not already served electronically through the Court's CM/ECF system.

> By: ___/s/   *Brian G. Rich*_____

3921325-2

## CM/ECF SERVICE LIST

Jason H. Egan
Office of the U.S. Trustee
110 E. Park Avenue
Suite 128
Tallahassee, FL 32301
Jason.h.egan@usdoj.gov

Lori V. Vaughan, Esq.
Trenam Kemker, P.A.
P.O. Box 1102
Tampa, FL 33601
lvaughan@trenam.com

15

**The Mary A II, LLC**
**Master Service List**
**Case No. 11-40693-LMK**

SC Advisors
SC Advisors 7, LLC
Mike Stone
223 East Blvd.
Charlotte, NC 28203

Claudia D. and David E. Calhoun
6053 Morris Road
Marcy, NY 13403

Mac, Baldeep, MAC1 FLP
816 North Third Street
Albemarle, NC 28001

R. Eugene Risser
42 Windcrest Drive
Lititz, PA 17543

Chad Hurst
11 Waterfront Estates Drive
Lancaster, PA 17603

Ed Bice
P.O. Box 4090
Mooresville, NC 28117

Brevard County Tax Collector
P.O. Box 2500
Titusville, FL 32781-2500

Hon. Pamela Cothran Marsh
U.S. Attorney
111 N. Adams Street, 4th Floor
U.S. Courthouse
Tallahassee, FL 32301

The Mary A II, LLC
Attn.: James M. Rudnick
226 North Duval Street
Tallahassee, FL 32301

Mac, Surendrapal
MAC 1 FLP
816 North Third Street
Albemarle, NC 28001

Linford Weaver
1852 Agape Court
East Earl, PA 17519

Alan Pierre
4416 Rosecliff Drive
Charlotte, NC 28277

Linda Price
1045 Lexington Drive
Moody, AL 35004

Hershey, Mark
40 E. 4th Avenue
Lititz, PA 17543

Lori V. Vaughan, Esq.
Trenam, Kemker, Scharf, et al.
Bank of America Plaza, Ste. 2700
101 E. Kennedy Blvd
Tampa, FL 33602

Internal Revenue Service
Attn.: Centralized Insolvency
Operations
P.O. Box 7346
Philadelphia, PA 19101-7346

The Honorable Eric H. Holder, Jr.
Attorney General of the U.S.
950 Pennsylvania Avenue, NW
Room 4400
Washington, DC 20530-0001

Office of the U.S. Trustee
Attn.: Jason H. Egan, Esq.
110 East Park Avenue, Ste. 128
Tallahassee, FL 32301

High Performance Investments, Inc.
1500 South Blvd., Ste. 201B
Charlotte, NC 28203

George & Edith Pierre
11714 Silmarillion Trail
Austin, TX 78739

Keith Snyder
3738 Daryl Drive
Landisville, PA 17538

Malik Enterprises
Bhajneet Singh Malik
1922 E. 7th Place
Los Angeles, CA 90021

Robin B. Bradley
7428 Waterview Drive
Cornelius, NC 28031

Federal Trust Bank
n/k/a Spur Ranch Enterprises, LLC
c/o Lewis W. Murphy, Jr., Esq.
2001 U.S. Highway 1
Vero Beach, FL 32960

Susan Sherrill, Esq.
Securities and Exchange Commission
Branch of Reorganization
3475 Lenox Road, N.E., #1000
Atlanta, GA 30326-1232

Internal Revenue Service
Insolvency Unit
1211 Governor's Square
Tallahassee, FL 32301

3896248-1

Trustco Bank
c/o Jeffry R. Jontz
P.O. Box 1961
Winter Park, FL 32790